IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ALLEN M. NOVOTNY, | |
| Plaintiff, | **8:16CV529** |
| vs. | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security; | **MEMORANDUM AND ORDER** |
| Defendant. | |

This matter is before the court on the plaintiff, Allen M. Novotny's, ("Novotny") appeal of the denial, initially and upon reconsideration, of his application for disability benefits under Title II of the Social Security Act ('the Act"), 42 U.S.C. §§ 401-434. *See* Filing No. 21 (Plaintiff's Motion to Reverse the Commissioner's Decision) and Filing No. 23 (Defendant's Brief in Support of the Administrative Decision). This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") that Novotny is not disabled. This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## BACKGROUND

### A.    Procedural History

The administrative record ("Admin. R.") has been filed with the court. Filing No. 13, Filing No. 14, Filing No. 15, Filing No. 16, Filing No. 17. Novotny applied for disability benefits on January 28, 2015, and alleges his disabilities include organic brain disorder, migraine headaches, mood disorder, anxiety disorder, and degenerative joint disease of both hips and the right shoulder. The alleged date of the onset of Novotny's

alleged disability is December 1, 2013. At that time Novotny was 31 years old. Novotny has an associate's degree and served in the United States Military as a marine from 2006 to March 30, 2015. The five years preceding his time in the Marine Corps., Novotny worked as a laborer for different construction companies. *Id.* at 35.

Novotny's application for disability was denied initially and on reconsideration. Novotny appealed the determination and requested a hearing before an administrative law judge ("ALJ"). The ALJ held a hearing on April 20, 2016, finding that Novotny was not disabled and not entitled to benefits. Admin. R. Attachment 2, Admin Process Docs, Filing No. 13. On May 17, 2016, the Appeals Council of the Social Security Administration ("SSA") denied his request for review. *Id.* Novotny seeks review of the ALJ's decision as the final decision of the Commissioner under 42 U.S.C. § 405(g).

### B.    Facts

A transcript of the hearing is found in the record at Admin. R. 29-77. Novotny testified he had not worked for pay since December 1, 2013. *Id.* at 33. Novotny stated that while he was in the Marine Corps., a grenade exploded two feet from him and that he was in the kill zone. *Id.* at 64. Novotny was then medevacked out on a helicopter to Al Assad Airbase where he received surgery to remove the shrapnel from his leg. *Id.* at 66. The doctors wanted to do further testing but he wanted to go back. *Id.* Novotny stated that he flew back to the battalion location on a helicopter and had to sit out for six days. *Id.* at 67-68. After a couple of weeks, Novotny was back to doing everything again. *Id.* at 68.

Novotny testified that from April 2011 until November 2013, he was a career counselor in the Marine Corps. *Id.* at 34. In that position, Novotny was a liaison between

headquarters, the Marine Corps., and the command at the unit. *Id.* at 39. Novotny said that he struggled with that job because his migraines increased due to the computer usage. *Id.* at 40. He joined the Marine Corps. in 2006 and he was an infantry rifleman after he completed boot camp. *Id.* at 36. In November 2010, after two deployments, Novotny reenlisted in the Marines. *Id.* at 37. He stated that he was hiding the extent of his injuries at that time, which then consisted of chronic pain, as well as issues with memory and concentration. *Id.* During Novotny's second enlistment, the Marines began the medical retirement process. *Id.* at 38. Novotny testified that the Marine Corps. concluded, at that time, that the amount of surgeries that he needed would extend his active duty time in the Marine Corps. *Id.* at 38. The Marine Corps. offered Novotny surgery at that time, but he declined. *Id.* Novotny would have to stay longer if he elected to have surgery, and just sitting around was too demoralizing for him, and therefore preferred to leave and attempt to heal himself at a slower pace. *Id.* at 62.

Additionally, Novotny declared his medical retirement was due to his mental health issues. *Id.* at 39. In the fall of 2013, he had an episode with another enlisted Marine, resulting in a scuffle between the two of them, and Novotny "ended up driving the k-bar off the wall." *Id.* at 39-40. Novotny testified that the Marine Corps. did not punish him for this offense because the other Marine did not want to press charges and instead recommended mental health counseling. *Id.* at 40-41. Subsequently, Novotny was transferred to the Wounded Warrior Battalion. *Id.* at 41.

Novotny's family moved to Nebraska in June 2015. He affirmed details about his age, weight, living situation, and family. *Id.* at 41-43. Novotny drives once or twice a day for a total time of maybe an hour at the longest per day, occasionally driving his

kids to and from school on the days that his physical and mental conditions allow him. *Id.* at 43-44. He completed his Associate's Degree in 2013, while he was still on active duty for the Marine Corps. *Id.* at 44. Novotny testified that he receives VA benefits and combat related special compensation from the Department of Defense. *Id.* at 45. Novotny mentioned his wife worked at times. *Id.* Novotny told the ALJ that he has both mental and physical conditions that prevent him from working and that the conditions affected him before he stopped working. *Id.* at 45. The conditions he had been hiding were: memory issues, concentration, getting lost in familiar places, daily headaches, severe migraines,[1] anxiety, depression, irritability, and chronic pain. *Id.* at 46.

Novotny testified that the Marine Corps. addressed his mental health by providing him with mental health counseling, psychiatric care, cognitive based therapies, and groups. *Id.* at 46. At some point, he was diagnosed with post-traumatic stress disorder ("PTSD"). *Id.* at 46-47. His symptoms for PTSD include: paranoia, hypersensitivity, trust issues, mood swings, mood lability, irritability, anger, nightmares, flashbacks, and disassociations.[2] *Id.* at 47. Novotny has had thoughts of suicide since 2011. He was treated in a hospital setting for suicidal thoughts on December 30, 2015. *Id.* at 47-48. At that time, the VA hospital in Omaha treated him by putting him back on his medication, and recommending inpatient treatment, which he declined. *Id.* at 48.

Novotny stated that because he did not like inpatient treatment his wife became his caregiver through the VA. *Id.* As his caregiver, she helps him with medications and

---

[1] Novotny testified that some of the headaches are tension headaches while his migraines tend to me more disabling, leaving him bedridden with the lights off and no sound. *Id.* at 46.

[2] Novotny testified that during a dissociation episode he does not know where he is and thinks something else is happening. *Id.* at 63.

his medical devices.  *Id.*  He testified that his medical devices are for pain and consist of an alpha stim unit and a flex unit.  *Id.* at 48-49.  Novotny stated that he uses these devices daily and they provide him with temporary relief.  *Id.* at 49.  His conditions give him pain in his: neck,[3] shoulders,[4] thoracic spine,[5] lumber spine,[6] hips,[7] and knees.[8]  *Id.* at 49-50.  He does not have to be doing activity for the pain to begin but the pain increases with activity where he uses the joint for more than 10-15 minutes.  *Id.* at 51. He stated that to relieve the pain, he takes different kinds of over-the-counter medications, such as Ibuprofen and Tylenol, ices the joints several times a day, and uses his medical devices.  *Id.*  He asserted that the discomfort from the pain and insomnia affect his sleep, and limits his sleep to 2-3 hours a night on average.  *Id.*  He wakes up from pain and nightmares, often thinking doors are open and feeling he needs to make sure everything is in place.  *Id.* at 52.

Novotny stated that he did not believe he could work an eight-hour day due to an inability to stay on task, anxiety, feeling overwhelmed and having panic attacks.  *Id.*  He has panic attacks almost every time he goes out in public, unless he has taken his medication.  *Id.* at 52-53.  He testified that he can sit for 20-30 minutes, but starts becoming uncomfortable after 15 minutes of sitting.  *Id.* at 53.  Novotny can stand or

---

[3] Sharp stabbing pain

[4] Dull pain generally but with activity, sharper pains

[5] Pulling, tugging sensation

[6] Pulling and tightness

[7] Sharp pains with overuse and movements, dull and achy pains on a daily basis

[8] Sharp pains, tender to the touch

walk for 10-15 minutes before he begins feeling fatigued and achy.  *Id.*  He testified that the Wounded Warrior Battalion prescribed him a cane for vestibular issues, sciatica,[9] and balance issues and he still experiences those issues.  *Id.* at 53-54. Novotny testified that he could probably lift a gallon of milk but it would be uncomfortable in his shoulder. *Id.* at 54.   He does not help with the housework, except occasionally he goes with his wife to the grocery store.  Those outings generally do not go well because he feels overwhelmed, has panic attacks, and snaps at his kids, his wife, or strangers.  *Id.* at 54-55.   Novotny said that he has gone to a few movies with his children, during the day when the theater is less crowded.  *Id.* at 55-56.  He stated that he enjoys golf but feels too much pain and discomfort after about 20-30 swings.   *Id.* at 56.  Novotny said that he tried playing golf two weeks before giving his testimony and that the prior year, he built up to being able to get through a round of golf "pretty good" using a cart.   *Id.* at 58.

Novotny testified that he would work if he were able to, however he has not attempted to find a job outside of the military.   *Id.* at 57.   He began a vocational rehabilitative service with the military but never went to the school due to anxiety, being overwhelmed, and no longer being physically able to do the program. *Id.* at 57-58. Novotny testified that after moving to Nebraska, he received treatment of yoga, acupuncture, psychotherapy, and a variety of medications for his mental health conditions.  *Id.* at 59-60.   The week prior to the hearing, he went to the chiropractor three times and he had three appointments scheduled the week of the hearing and that after that, the appointments would begin to be spread out more.  *Id.* at 61.   The

---

[9] Novotny testified that sciatica is a nerve impingement in his lower back that causes shooting pain down his legs. *Id.*

chiropractor had been very helpful for loosening the muscles and that his wife noticed a large difference while giving him massages. *Id.* Novotny stated he also had a Magnetic Resonance Imaging ("MRI") test the day before the hearing and was waiting to see if the doctors suggest physical therapy or surgery. *Id.* at 61.

A vocational expert ("VE") also testified at the hearing. She was asked whether a hypothetical worker with Novotny's past relevant work experience, as a laborer and marine, with the same physical and mental limitations, being limited to light work, was able to climb ladders, stoop, kneel, crouch, and crawl occasionally. But, if the hypothetical worker was limited to work that did not require climbing ladders, exposure to hazards, sustained and concentrated noise, or dust, was able to perform work that is simple, respond appropriately to routine changes in the work environment, was able to perform work that does not require more than a brief interaction with public, or working in close coordination with others would be able to find work in the national economy. *Id.* at 69-70. The VE said the hypothetical worker would be able to find work as a routing clerk, folding machine operator, or housekeeping cleaner. *Id.* at 70.

The VE was then asked if the assumption of light work were changed to sedentary work, whether there would be an occupational base for the individual. *Id.* She said the hypothetical individual would be able to be employed as a final assembler, document preparer, or table worker. *Id.* The ALJ then asked Novotny whether he believed he could be a document preparer and described the duties. *Id.* at 69-70. Novotny testified he believed it would be a struggle because of his difficulty sitting for long periods of time and because staring at a computer screen for a long period would increase his migraines. *Id.* at 71. The ALJ then clarified that he did not believe there

would be any computer screen at that type of job and Novotny said he would try it and if he could not do it, the reason was likely his mental health, specially his fear of failure. *Id.* at 71-72.

Novotny's attorney then asked the VE to assume a hypothetical person were limited in his ability to understand, remember, and carry out detailed instructions 25% of the time, were limited in his ability to maintain attention and concentration, maintain regular attendance, be punctual, and complete a normal work day 25% of the time, were limited in the ability to interact appropriately with people 25% of the time and were limited in the ability to respond appropriately to change 25% of the time, and asked whether that person would be able to do any work. *Id.* at 74. The VE responded that a person not able to attend work as scheduled 25% of the time would prevent them from succeeding at any job. *Id.*

### C. Medical Evidence

As previously stated in the hearing testimony, a grenade exploded near Novotny in November 2007 and he was flown to an air base for care for the shrapnel in his right leg. *Id.* at 587. In April 2013, Novotny sought treatment for bilateral hip pain and received treatment of physical therapy. *Id.* at 1477-1479. In May 2013, an MRI of Novotny's hips revealed an anterior/superior labral tear. *Id.* at 723-724. Also in May 2013, x-rays revealed tiny shrapnel in the soft tissues of his calf. *Id.* at 775-76. His treatment consisted of corticosteroid injections and physical therapy, and he was referred to an orthopedic surgeon for a consult. *Id.* at 1446-48. In August 2013, Novotny saw Dr. Schauer at Camp LeJeune with his chief complaint being lower back pain and she ordered an MRI. *Id.* at 1398-1400.

In June 2013, Dr. Mobley prescribed Prozac for Novotny's mood and Ambien for his insomnia. *Id.* at 1434-35. Novotny reported he disliked his career planner position and was having nightmares. *Id.* at 1435-36.

In September 2013, Novotny had a pre-operation consult with Dr. Castillo. After Dr. Castillo observed that Novotny was using a cane due to lower back pain, Dr. Castillo recommended waiting for hip surgery. *Id.* at 1392. Around that same time, September 2013, Novotny reported to Dr. Mobley that he had dropped out of his college courses due to feeling overwhelmed by the medical issues. *Id.* at 1386.

In October 2013, Novotny received counseling and discussed an incident that occurred in 2009 in which three Marines were killed by an IED. He expressed guilt associated with that incident. *Id.* at 1378. Novotny also described a time when lightning struck close to his car while he was driving in Jacksonville, North Carolina with his wife and for a few moments, Novotny felt like he was back in Iraq. *Id.* In another counseling session in October, Novotny reported feelings of guilt over a friend's death. *Id.* at 1360. Novotny reported his pain was the level of a 9, on a scale from 1 to 10, to Dr. Scott Johnston M.D. in October 2013 and characterized the pain as aching and stabbing. *Id.* at 462. Dr. Johnston recommended that Novotny stop taking Oxycodone and Valium and start taking a Butrans patch[10] and Nucynta[11] as well as enroll in pain management treatment. *Id.* at 465. In October 2013, Novotny also saw Dr. White who told him about Alpha Stim technology and referred him for alpha stim therapy treatment. *Id.* at 1333.

---

[10] Butrans patch is used for management of pain severe enough to require daily, around the clock, long term opioid treatment and for which alternative treatment options are inadequate.

[11] Nucynta is a drug used to alleviate neuropathic pain associated with diabetic peripheral neuropathy.

In November 2013, Novotny received treatment at the Traumatic Brain Injury Clinic. *Id.* at 1278. He reported to Dr. Christina Fitzpatrick that his goals were to minimize the numbers of headaches, stop his short-term memory loss, and find out "what's going on upstairs." *Id.* at 2220. That same day, Dr. Joyce Wagner prescribed him Topamax, fish oil, and magnesium oxide for his headaches, referred him to an audiology consult for his traumatic brain injury, ordered an antinuclear antibody screen and rheumatoid factor test for his insomnia and prescribed him a nicotine patch. *Id.* at 2218. She also discontinued Amitriptyline[12] and fiurinol with codeine. *Id.*

In December 2013, Novotny saw Dr. Fitzpatrick again. *Id.* at 1265. She prescribed 8 sessions of physical therapy and Novotny received a score of 28/30 on a functional gait assessment when using his cane. *Id.* at 1266. The next day, Dr. Nina Patelhinkle saw Novotny for neck pain. *Id.* at 1254. Dr. Patelhinkle treated Novotny with acupuncture, prescribed a TENS unit and stretches for Novotny to perform at home, and ordered OMT (osteopathic manipulation therapy). *Id.* at 1205.

In January 2014, Novotny received trigger point injections. *Id.* at 454. Dr. Chaney increased his dosage of Nucynta and prescribed a fentanyl patch instead of Butrans. *Id.* at 450. Also in January 2014, Dr. Wagner changed Novotny's medication back to Topiramate from Neurontin after Novotny reported better control of headaches with Topiramate. *Id.* at 1200. Dr. Wagner also increased the dosage of Prazosin[13] and scheduled a sleep group after Novotny reported his sleep was spotty. *Id.* Novotny also

---

[12] Amitriptyline is a drug used for the treatment of depression.

[13] Prazosin is a medical drug that is prescribed to help patients that are suffering from hypertension.

met with Dr. Pollack and completed some psychological tests. *Id.* at 1066-67. Dr. Pollack's test indicated that Novotny had processing speed deficits on some tasks and had weaknesses in verbal delayed memory for a "complex narrative passage read to him approximately 20 to 30 minutes prior." *Id.* at 1072. Dr. Pollack recommended Novotny continue with psychotherapy treatments and take his psychotropic medication to help with the reduction, control or alleviation of his depressive and anxiety symptoms. *Id.* 1072-73. Additionally, Dr. Pollack recommended that if Novotny were to decide to attend school, he would need to be allowed double time to complete assignments due to the processing deficits found in his tests. *Id.*

In February 2014, Novotny had an MRI of his cervical spine, which showed some bulging or thickening of posterior paraspinal musculature posterior and mild spondylotic changes. *Id.* at 772. He also met with Dr. Carl Steed, who diagnosed him with PTSD, Depressive Disorder, and Pain Disorder, suggesting to rule out Personality Disorder. *Id.* at 1143. He met with Dr. Steed again later in the month and reported having a headache for the last 2 days and having nightmares for the past week. *Id.* at 1113.

On April 4, 2014, Dr. Wendy Gaza evaluated Novotny at Camp LeJeune Neurology Clinic for treatment of his headaches. *Id.* at 1032. Novotny stated that his headaches began in 2007 after he was two feet away from a hand grenade on a dismounted patrol in Iraq. *Id.* Novotny stated he continued to have headaches while treated with Topamax and lost 40 pounds due to loss of appetite, although Novotny found the medication worked. Novotny switched back to Gabapentin and found that it

made him groggy, and continued to use Maxalt[14] for rescue therapy.  *Id.*  Novotny reported that he had chronic daily headaches and more severe headaches that occurred about 1-2 times a week.  *Id.*  Novotny reported that he had difficulty sleeping and was only sleeping 3 to 5 hours per night due to nightmares.  *Id.* at 1033.

On April 4, 2014, Dr. Mathew Swain examined Novotny's shoulder.  *Id.* at 2062-63.  Dr. Swain noted that Novotny's right shoulder was "grossly unstable" according to Dr. Swain's evaluation of Novotny's MRI.  *Id.*  The MRI showed a large tear of the anterior labrum, supraspinatus tendinosis, biceps tendinosis, and no evidence of atrophy.  *Id.* at 770-71.

On April 23, 2014, Dr. Christopher Nelson evaluated Novotny's psychiatric medications.  *Id.* at 1009-13.  The report stated that Novotny felt mostly anxiety and irritability, and occasional panic.  *Id.* at 1011.  Dr. Nelson's notes stated that Novotny met all the diagnostic criteria for both PTSD and Panic Disorder without Agoraphobia. Dr. Nelson prescribed continued use of Buspar for panic, Lithium[15] to help with anger and irritability, and started Novotny on Rozerem,[16] Effexor,[17] and Clonidine.[18]  *Id.*

---

[14] Maxalt is a prescription drug used for the acute treatment of migraines.

[15] Lithium is a prescription given to patients with bipolar disorder to treat manic episodes and maintenance therapy.

[16] Rozerem is a treatment of insomnia.

[17] Effexor is a treatment for generalized anxiety, major depressive disorder, panic disorder, and social anxiety disorder.

[18] Clonidine is a drug given to patients with hypertension.

Over the span of several months, starting on May 2, 2014, to October 17, 2014, Novotny received several trigger point injections and several alterations to his medications. *Id.* at 412, 417-20, 421, 424, 434-35, 440-41.

On July 23, 2014, Dr. Nelson again adjusted Novotny's medication plan. *Id.* at 951. Dr. Nelson prescribed a different dose of lithium for continued anxiety and irritability, a double-dose of Rozerem to reduce insomnia, and started Novotny on a trial of Abilify for daytime paranoia. *Id.* On October 29, 2014, Novotny reported that his word-finding and memory problems were worse although no changes to his medications had occurred. *Id.* at 892. Dr. Nelson decided to hold Novotny's use of lithium unless Novotny was unable to control his mood and temper without the lithium prescription. *Id.*

On November 20, 2014, Dr. Steed conducted an individual psychotherapy session with Novotny, reporting that Novotny appeared to be somewhat reserved and sullen. *Id.* at 876-77. Novotny was dressed in uniform due to changes in the Wounded Warrior Battalion and stated that he felt overwhelmed by home stressors and financial concerns. *Id.* The summary of Dr. Steed's session noted Novotny had been in an incident at work while his family was accompanying him. *Id.* at 878. Novotny's wife was reportedly alarmed by her husband's reaction and Novotny was unable to calm himself down until two hours after the incident occurred. *Id.*

On January 14, 2015, Novotny visited with Dr. Steed at the mental health clinic. *Id.* at 823. Dr. Steed noted that Novotny "dreads returning to the cold climate of Nebraska" and while in Nebraska over the holidays, his mood worsened. *Id.* at 825. Novotny reported to feeling overwhelmed and struggling to find a purpose since his medical retirement from the Marines. *Id.* On February 6, 2015, Dr. Steed held a

session with Novotny and his wife. *Id.* at 797. His wife reported her observations of her husband's depression, and his increased energy level once a month, in which Novotny would not sleep for two to three days while particularly focused on a single project. *Id.*

On June 10, 2015, Novotny began receiving treatment at the Omaha, Nebraska VA. *Id.* at 1749-1843. The exam at the Omaha VA showed that Novotny had limited range of motion of his spine, and recommended he continue to receive treatment for his PTSD at the mental health clinic. *Id.* 1806-09. On June 15, 2015, Novotny began treatment at the VA's traumatic brain injury ("TBI") clinic, and he stated that he was still having severe migraines and other TBI-related symptoms. *Id.* at 1768-72. Novotny reported his headaches were daily, and were aggravated by loud noise, tension, and stress. *Id.*

Upon moving to Omaha, Novotny had stopped all of his mental health medications, causing his condition to deteriorate. *Id.* at 2835. On December 29, 2015, Novotny had made a statement two weeks prior about using a gun to kill himself; a gun was no longer present in the home. *Id.* Novotny began using marijuana regularly since June, and was against use of narcotics for his chronic pain. *Id.* On March 9, 2016, Novotny reported to mental health doctors that he had fallen seven times the previous winter due to his weakness and numbness. *Id.* at 2899. Novotny continued to display slow motor behavior and use of a cane during the exam. *Id.*

### D. Veterans Administration Rating

On April 6, 2015, Novotny received notice from the Department of Veterans Affairs ("DVA") regarding his entitlement to VA benefits. *Id.* at 222. The DVA concluded that Novotny's overall combined disability rating is 100%. *Id.* at 239. The DVA found

that Novotny's frequent migraine headaches with visual aura caused severe economic inadaptability, and contributed to 50% of his disability. *Id*. at 224. Novotny was assigned a 70% rating for his PTSD, insomnia disorder, and major depressive disorder because his near continuous panic affected his ability to function independently, appropriately, and effectively. *Id*. at 226. The DVA also found Novotny's PTSD caused occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, and difficulty in understanding complex commands. *Id*. The DVA found other impairments contributed to Novotny's 100% disability rating. He received a 20% disability rating for sciatica right hip with moderate incomplete paralysis; a 20% disability rating for right dominant upper radicular group radiculopathy with mild incomplete paralysis of the major extremity; a 30% disability rating for mild degenerative changes in his neck and upper back for lack of range of motion; and a 40% disability rating for mild neurocognitive disorder due to TBI (claimed as memory loss) for occasional disorientation as to person, time, place, and situation. *Id*. at 224-39.

The percentages assigned to each one of Novotny's issues were not added together to determine his combined disability rating. *Id*. at 239. However, the DVA's table rating of all of Novotny's issues led to a combined overall rating of 100% disabled. *See id*.

## E.    The ALJ's Findings

The ALJ found that Novotny is not disabled. *Id*. at 24. The ALJ followed the established five-step sequential evaluation process established by the Social Security

Act to determine if an individual is disabled.[19]  20 C.F.R. §§ 404.1520(a)-(f).  At step one, the ALJ found that Novotny has not engaged in substantial gainful activity since December 1, 2013, the alleged onset date of Novotny's disability.  Admin. R. at 15.  At step two, the ALJ found that Novotny has several severe impairments such as degenerative disc disease, organic brain disorder, migraine headaches, mood disorder, anxiety disorder, degenerative joint disease of the hips bilaterally, and degenerative joint disease of the right shoulder.  *Id.*  The ALJ determined that Novotny's impairments have more than a minimal effect on his ability to perform basic work functions, and produce limitations that meet the definition of severe.  *Id.*  Next, at step three, the ALJ determined that Novotny does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R §§ 404.1520.  *Id.*  The ALJ stated that Novotny's impairments could not establish disability on medical facts alone.  *Id.*

According to the ALJ, the severity of Novotny's mental impairments do not meet the criteria of listings found at § 12.02 (neurocognitive disorders), § 12.04 (affective disorders), and § 12.06 (anxiety-related disorders).  *Id.* at 15-16. The ALJ reviewed Novotny's mental impairments according to the criteria set forth in paragraph B, evaluating activities of daily living, maintaining social functioning, maintaining concentration, or repeated episodes of decompensation.  *Id.*  The ALJ found that Novotny was able to function at an appropriate level for daily living and social

---

[19] *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work") (quotation and citation omitted).

functioning, but Novotny had noted difficulty focusing, concentrating, and paying attention long enough to complete appropriate tasks commonly found in the workplace. *Id.* at 16. In making this determination, the ALJ discredited Novotny's testimony of his own condition and gave little weight to Novotny's difficulty interacting with members of his own family and others. *Id.* at 16. The ALJ disregarded the testimony of Novotny's wife as a third party observer because the ALJ ruled these observations as unreliable due to her lack of medical training. *Id.* at 18.

The ALJ gave little weight to the DVA's 100 percent disability rating based on Novotny's PTSD and the totality of his evaluated issues. The ALJ discounted the DVA's findings for the following reasons: 1) the rating was made by someone whose identity, training, and professional qualifications are unknown; 2) the conclusions are based on symptoms rather than functional limitations; 3) the DVA rating is based on standards that fundamentally differ from that applied by the ALJ; and 4) the DVA rating is based on evidence that differs from the ALJ's record. *Id.* at 21.

Next, at step four, the ALJ determined that Novotny's past relevant work as a United States Marine and construction worker would exceed his current ability to perform such tasks. The ALJ relied on the VE's testimony that a hypothetical worker similar to Novotny would be unable to complete his past work, as the demands of Novotny's past work would exceed his current residual functional capacity. *Id.* at 22.

Lastly, at step five, based upon the testimony of the VE, the ALJ found there are jobs existing in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. *Id.* at 23. The ALJ concluded that the VE's suggestion that Novotny could perform jobs as a routing clerk,

folding machine operator, and cleaner/housekeeper were all within Novotny's residual functional capacity. *Id.*

Novotny argues that the ALJ did not give proper weight to the DVA's finding that he is 100% disabled, and contends that the ALJ's findings are inconsistent with DVA's determination that Novotny could not function independently, appropriately, and effectively. *Id.* at 226. Further Novotny argues that the ALJ failed to consider his possible consistent absences from work due to his migraine headaches and physical ailments.

## LAW

The court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion. *Id.* The court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). However, the court's review is "more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp'" of the Commissioner's decision. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (internal citations omitted). In determining whether substantial evidence in the record supports the decision, the court must consider evidence that both detracts from and bolsters the Commissioner's decision. *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (citations omitted).

The court must also determine whether the Commissioner's decision "is based on legal error." *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000) (citations omitted). The court owes no deference to the Commissioner's legal conclusions. *See Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008).

A claimant's residual functional capacity ("RFC") is what he can do despite the limitations caused by any mental or physical impairments. *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014); 20 C.F.R. § 404.1545. The ALJ is required to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. *Papesh v. Colvin*, 786 F.3d 1126, 1131 (8th Cir. 2015). The RFC must (1) give appropriate consideration to all of a claimant's impairments, and (2) be based on competent medical evidence establishing the physical and mental activity that the claimant can perform in a work setting. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

At step five of the sequential analysis, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy the claimant can perform. *Id.*; *see Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010).

To satisfy the burden to show the claimant is capable of performing other work, the ALJ is generally required to utilize testimony of a vocational expert if the claimant suffers from nonexertional impairments that limit his ability to perform the full range of work described in one of the specific categories set forth in the guidelines. *Jones,* 619 F.3d at 971–72. In order for a vocational expert's testimony to constitute substantial

evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments. 20 C.F.R. §§ 404.1520(a)(4)(v); *see Taylor v. Chater*, 118 F.3d 1274, 1278 (8th Cir. 1997) (stating that a vocational expert's testimony may be considered substantial evidence "only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies"). "When a hypothetical question does not encompass *all relevant impairments*, the vocational expert's testimony *does not constitute substantial evidence*." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 377 (8th Cir. 2016) (quoting *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001)) (emphasis added).

The ALJ must give "controlling weight" to a treating physician's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. *Papesh,* 786 F.3d at 1132. Even if not entitled to controlling weight, a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. *Id.* The regulatory framework requires the ALJ to evaluate a treating sources' opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source. *Id.*; *see* 20 C.F.R. 404.1527(c)(2). "When an ALJ discounts a treating [source's] opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007); *Jenkins v. Apfel*, 196 F.3d 922, 924-25 (8th Cir. 1999) (stating the ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions).

The ALJ must evaluate subjective complaints with full consideration to all of the evidence presented and may not discount a claimant's allegations solely because objective medical evidence does not fully support them. *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th Cir. 2003). In evaluating a claimant's allegations, in addition to the objective medical evidence, an ALJ must consider a claimant's prior work history, observations by third parties and treating and examining physicians relating to such matters as: 1) the claimant's daily activities; 2) the duration, frequency and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; 5) functional restrictions. *Id.* Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998). "A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal medical treatment and/or has taken only occasional pain medications." *Singh*, 222 F.3d at 453; *see O'Donnell*, 318 F.3d at 818 (questioning "whether a claimant who is intentionally exaggerating her symptoms for financial gain would seek out" extensive treatment and evaluations); *Cox v. Apfel*, 160 F.3d 1203, 1207 (8th Cir. 1998) (questioning whether a claimant with many "years of medical records detailing repeated complaints of severe pain" and treatments for severe pain could be found not credible).

An ALJ cannot rely on the claimant's ability to perform limited functioning during a period of low stress as substantial evidence that a claimant who sometimes experiences high stress is not disabled. *Hutsell v. Massanari*, 259 F.3d 707, 713 (8th Cir. 2001). Given the unpredictable course of mental illness, "[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility

of relapse." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Moreover, "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E). "Such individuals may be much more impaired for work than their signs and symptoms would indicate." *Andler*, 100 F.3d at 1393.

## DISCUSSION

The court finds that substantial evidence in the record supports a finding that Allen M. Novotny is disabled. The ALJ erred in affording little weight to Novotny's treating physicians regarding his physical and mental limitations. The ALJ should grant considerable weight, if not controlling weight, to medical opinions from treating medical professionals. The record shows that numerous medical professionals met with and treated Novotny over the span of several years. All attempted to prescribe the correct medications to alleviate Novotny's continued physical and mental ailments. Both Doctors Nelson and Steed found that Novotny met all the symptoms and criteria of PTSD. Dr. Nelson also found that Novotny met all the criteria of panic disorder, prescribing him with several medications to help deal with his anger, anxiety, irritability, paranoia, and insomnia. Additionally, the record shows that Novotny suffered from short-term memory loss and difficulty concentrating. The treating psychologists' diagnoses are supported by objective evidence.

The ALJ also failed to afford appropriate weight to the DVA's assignment of 100 percent disability to Novotny. The court recognizes that the Social Security Administration and the DVA have varying standards for disability. However, the basis for the DVA's disability rating for mental illness is consistent with the Social Security

Administration's functional limitations. The DVA's disability evaluation, like the criteria used by the Social Security Administration, assesses how a mental disorder limits areas of mental functioning that a person uses in a work setting—such as the abilities to understand, remember, and apply information; to concentrate, persist, or maintain pace; and to adapt or manage oneself. The DVA's finding that Novotny had considerable difficulty in adapting to stressful situations, and occupational impairments with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood were supported by the record. The DVA's finding is consistent with the reports of Novotny's treating medical professionals and should have been considered. The ALJ improperly relied on the moments when Novotny displayed minimal agitation or was temporarily symptom free. The ALJ's finding that determined Novotny could perform as a routing clerk, folding machine operator, or housekeeping cleaner is unsupported in the record as the type of behavior Novotny typically portrayed as being capable to perform such tasks.

Furthermore, the ALJ erred in discounting Novotny's subjective complaints of insomnia, nightmares, panic attacks, and difficulty controlling his emotions when in public. Novotny's continued treatment for these and other symptoms related to his disorder adds to his credibility. The extent of the treatment he sought is comparable to such a level of severity of the complaints. There is evidence in the record that Novotny had considerable difficulty concentrating and possessed processing speed deficits. The ALJ failed to evaluate properly the totality of Novotny's condition, thus presenting an improper hypothetical to the VE that did not accurately reflect Novotny's condition and limitations. The VE's opinion does not constitute substantial evidence to satisfy the

Commissioner's burden to prove there are jobs in the national economy that a person in Novotny's situation can perform. Novotny's impairments—including absences from work 25% of the time, inability to sit longer than 15-25 minutes, difficulty understanding and carrying out instructions, and difficulty interacting appropriately with supervisors or co-workers are fully supported by the record and would cause substantial difficulty in any employment. The testimony of the VE supports a finding that there are no jobs in the national economy that a person with Novotny's impairments could perform.

The court finds that "clear weight of the evidence fully supports a determination [Novotny] is disabled within the meaning of the Social Security Act." *See Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009). The Eighth Circuit has repeatedly approved of immediately awarding benefits based on the controlling weight afforded to the opinion of claimant's treating medical provider. *See id.*; *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003); *Cunningham v. Apfel*, 222 F.3d 496, 503 (8th Cir. 2000); *Singh*, 222 F.3d at 451. Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate. *Hutsell*, 259 F.3d at 714.

Accordingly,

IT IS ORDERED:

1. The plaintiff's motion to reverse the Commissioner's decision (Filing No. 21) is granted;

2. The defendant's motion to affirm the Commissioner's decision (Filing No. 22) is denied;

3. The decision of the Commissioner is reversed;

24

4.   This action is remanded to the Social Security Administration for an award

of benefits.


Dated this 29th day of November, 2017.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge